This appeal concerns whether Robert Rossen — a truck driver whose services were secured by R.P. Gray, the independent owner and operator of the truck in which Rossen suffered a permanent partial disability as a result of an automobile accident — can properly bring a claim for benefits under the Alabama Workers' Compensation *Page 902 
Act, § 25-5-1 et seq., Ala. Code 1975, against Alaplex, Inc. ("Alaplex"), a common carrier that had entered into a lease agreement with Gray.
The record reveals that Rossen was involved in an automobile collision in October 1997 along Interstate Highway 95 while transporting a load of automobiles from Charleston, South Carolina, to Cape Canaveral, Florida. After the collision, Rossen, who was 64 years old at the time, was hospitalized in Florida for two nights; he later sought treatment from a physician in Gadsden for neck and shoulder problems purportedly related to the collision.
At the time Rossen was involved in the collision, he was operating a truck leased by Alaplex from Gray pursuant to an agreement that contained, among other things, the following terms:
 "Carrier [Alaplex] is engaged in the interstate . . . transportation of commodities as a common . . . carrier under authority from the Interstate Commerce Commission (hereinafter `ICC') and the Alabama Public Service Commission (hereinafter `APSC');
 ". . . Contractor [Gray] is engaged in the transportation of freight by motor vehicle.
". . . .
 "2. Contractor hereby agrees to furnish to Carrier upon the latter's request the equipment described Appendix `A' [i.e., two tractors and two trailers]. Carrier shall have the exclusive possession, control, and use of the equipment furnished by Contractor for the duration of this agreement.
 "3. Carrier agrees to pay Contractor 85 percent of gross revenue derived by Carrier from the full and proper performance of this agreement by Contractor subject, however, to the following conditions:
 "(A) Payment shall be withheld until submission to Carrier of all properly completed documents and paperwork related to the transportation of commodities as may be required by Carrier, the ICC, the United States Department of Transportation (hereinafter `DOT'), or any other governmental entity or agency, including but not limited to all delivery receipts, bills of lading, driver's logs, destination records, and driver's fuel tax reports.
". . . .
 "5. Contractor agrees that all equipment furnished hereunder shall be subject to the inspection and approval of Carrier as to compliance with the rules and regulations of the DOT and various states in or through which Carrier operates. It is further understood that Contractor's equipment for the duration of this agreement shall be in compliance with all federal and state regulations presently in force or enacted in the future, and that any expense associated therewith is and shall be borne by Contractor.
 "6. If the Contractor determines that it is necessary to use drivers, driver helpers, laborers or others to perform the work under this agreement, they shall be employed at the Contractor's expense. Such employees shall be qualified under and meet all requirements of applicable federal and state laws and municipal ordinances and the rules and regulations of the ICC, DOT, APSC and any other governmental agency having jurisdiction in such matters, and such qualifications shall be satisfactorily proven to Carrier prior to performance of driving duties. . . . Carrier reserves the right to decline to load any driver based on qualifications, performance or any inadequacies as deemed necessary by Carrier. Carrier does not, however, assume *Page 903 
 any responsibility for direction and/or control of Contractor's employees. Contractor shall be solely responsible for the direction and control of its employees in fulfilling its obligations under this agreement including but not limited to:
 "(A) The rejection of any loads, choice of lawfully authorized routes, the number of drivers and helpers to be used, points for servicing equipment, rest stops and other similar or pertinent matters;
 "(B) Selecting, hiring, supervising, directing and training its employees; and
 "(C) Setting of wages, hours and working conditions, and the paying or adjusting of any grievance relating to any service provided under this agreement by any of its employee.
". . . .
 "10. Contractor agrees to and shall comply with all applicable [workers'] compensation statutes concerning its employees, and Contractor shall indemnify and hold Carrier harmless for all claims and demands thereof that may be made against Carrier. Contractor further agrees that any and all costs incurred in the handling, settling, and/or defending any and all claims, including court costs and attorneys fees, will be paid by Contractor, and that Carrier reserves the right to obtain legal counsel, file legal action and/or obtain professional services as deemed necessary by Carrier in order to protect Carrier's interest at Contractor's expense. Contractor agrees that any such expenses are payable upon demand and may be withheld from any sums of money due to Contractor by Carrier.
". . . .
 "16. Contractor agrees to conduct all activities and personal conduct in the best business interest of Carrier and to perform the transportation under this agreement in a safe, competent and workmanlike manner and at the earliest time practicable and permissible under ICC, APSC and DOT rules and regulations, after the freight is tendered for movement by the shipper . . . .
 "17. Contractor agrees to comply with all of the terms and conditions, rules and regulations, and company policies as set forth in Alaplex['s] Owner-Operator/Driver's Manual and any revisions thereof as may be issued from time to time during the course of this agreement. A copy of same is attached hereto and incorporated into this lease agreement. Contractor further acknowledges that Contractor has received and understands the aforementioned Owner-Operator/Driver's Manual.
". . . .
 "19. . . . The parties agree that Contractor is and shall be an independent contractor free from any control of Carrier as to means and methods of accomplishing results herein contracted for and that there shall be no relationship of employer and employee at any time under any circumstances or for any purpose between Carrier and Contractor or Contractor's drivers, agents, servant or other employees.
 "20. Carrier may, at its own discretion advance mon[ey]s to Contractor or on Contractor's behalf for repairs, permits, tags, insurance or other expenses; and Contractor agrees that any such advance(s) will become a debt of said Contractor and shall be due upon demand."
The record reveals that Rossen was hired by Gray in 1988 and that he drove trucks for Gray for nine years; during the majority of that time, Gray's trucks were leased exclusively to Alaplex. Gray paid Rossen one-quarter of the gross revenue *Page 904 
Gray received from Alaplex as a result of Rossen's hauling of loads for Alaplex; however, Gray did not withhold taxes on Rossen's behalf. With respect to workers' compensation coverage, Gray had informed Rossen that Alaplex would not provide that coverage for Rossen. Gray did not himself provide workers' compensation coverage for Rossen, but he had assisted Rossen in securing occupational insurance to cover any injuries he might sustain. Rossen's occupational-insurance carrier paid his medical bills after his injury and made disability payments to Rossen amounting to approximately $600 each month for 13 months after his injury; however, those payments have ceased because that insurance coverage did not provide for the continuation of disability payments beyond Rossen's reaching 65 years of age.
In April 1999, Rossen sued Alaplex seeking benefits under the Workers' Compensation Act. Alaplex's motion to dismiss was denied. Alaplex then filed a motion for a summary judgment, contending that under §25-5-1(4), Ala. Code 1975, Alaplex was not, as a matter of law, Rossen's "employer" so as to subject Alaplex to liability under the Act. The trial court denied Alaplex's summary-judgment motion, but ordered separate hearings on the two issues presented: whether an employer-employee relationship existed between Alaplex and Rossen and, if so, what benefits Rossen should receive from Alaplex.
After the first hearing, the trial court entered an order concluding that Rossen was an employee of Alaplex at the time of the collision. In so ruling, that court relied upon evidence tending to show that Rossen had been paid based upon the loads provided by Alaplex; that Alaplex's dispatchers had instructed Rossen to pick up and deliver shipments in the same manner that those dispatchers had instructed Alaplex's own employees; that Rossen was expected to contact Alaplex should he encounter problems on the road or should he need an advance for expenses; that Rossen was required to comply with procedures imposed by Alaplex, its customers, and DOT; that Alaplex had held meetings with Rossen and other drivers; that Alaplex had issued "certificates of appreciation" to Rossen in 1991 and 1996; and that under federal precedents and regulations, Rossen would be classified as a "statutory" employee of Alaplex.
Alaplex filed a third-party complaint against Gray, asserting that Gray had a contractual duty under the equipment lease between Alaplex and Gray to defend and indemnify Alaplex as to Rossen's claim. Rossen moved to sever the third-party claim; that motion was denied. Gray then asserted a claim against Rossen, seeking damages arising from damage to the truck Rossen was operating at the time of the collision. Alaplex filed an answer in February 2000 in which it denied that it had been Rossen's employer, contended that Rossen had engaged in willful misconduct in causing the accident, and asserted that the applicable statute of limitations barred Rossen's claim. Rossen's occupational-insurance carrier was then permitted to intervene to protect its subrogation interest. Alaplex filed a second summary-judgment motion, asserting that the collision in which Rossen was involved was not the proximate cause of his disability, and Gray filed a summary-judgment motion making the same assertion; however, the trial court denied both of those motions.
The trial court then held an ore tenus proceeding concerning Rossen's entitlement to benefits under the Workers' Compensation Act. During that proceeding, Alaplex and Gray moved for a judgment on partial findings (see Rule 52(c), Ala.R.Civ.P.) at the close of Rossen's evidence and at *Page 905 
the close of all the evidence, asserting not only the grounds stated in the previous summary-judgment motions, but also arguing the application of the doctrine of "quasi-judicial" estoppel and misconduct. After denying these dispositive motions, the trial court entered a judgment directing Alaplex to pay Rossen temporary-total-disability and permanent-partial-disability benefits under the Workers' Compensation Act based upon its finding that Rossen had suffered a 25 percent disability as a result of the collision. However, the trial court entered a judgment in favor of Alaplex on its third-party claim against Gray and directed Gray to indemnify Alaplex as to the compensation award and to pay attorney fees to Alaplex of $7,500. All other relief was denied. Alaplex appeals.
Because jurisdictional issues, including that of standing, should be considered by an appellate court ex mero motu (see C.Y.M. v. P.E.K.,776 So.2d 817 (Ala.Civ.App. 2000), and Scheinert v. Southern Rubber Co.,764 So.2d 1291, 1292 (Ala.Civ.App. 2000)), we must first address the issue of Alaplex's standing to appeal. As we have noted, the trial court entered a judgment in favor of Alaplex on its third-party claim, i.e., it ordered Gray to indemnify Alaplex as to its workers' compensation payments to Rossen and its attorney fees and costs. Thus, Alaplex is arguably not an aggrieved party having a genuine stake in the outcome of this appeal.
However, when a similar situation presented itself in Bolack v.Underwood, 340 F.2d 816 (10th Cir. 1965), the United States Court of Appeals for the Tenth Circuit concluded that to dismiss an appeal brought by a party from a judgment favorable to the plaintiff but unfavorable as to a third-party defendant "would detract from the benefits of third party practice and would be inconsistent with the inherent policy of Rule14(a), Fed.R.Civ.P." 340 F.2d at 819. In accord is Aetna Cas. Sur. Co. v. Smith, 127 A.2d 556 (D.C. 1956), in which the District of Columbia Court of Appeals declined to hold that the recovery of a judgment against a third-party defendant precludes a third-party plaintiff from appealing the judgment against it in favor of the plaintiff, saying that to do so "would be an unwarranted restriction of a party's right to appellate review." 127 A.2d at 558. In the absence of any indication in the record that Alaplex has executed on its judgment against Gray, we deem it similarly inappropriate to dismiss Alaplex's appeal for lack of standing on the basis that Alaplex prevailed on its third-party claim.
We thus proceed to consider the merits of Alaplex's appeal. The standard of review in a workers' compensation case was stated by our supreme court in Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala. 1996):
 "[W]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidence — if that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
680 So.2d at 268-69 (quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989)). However, "an appellate court's review of the proof and its consideration of other legal issues shall be without a presumption of correctness." American Color Graphics, Inc. v.Foster, [Ms. 2000044, Sept. 28, 2001] ___ So.2d ___, ___ (Ala.Civ.App. 2001) (citing Ala. Code 1975, § 25-5-81(e)(1)).
The origin of the modern Workers' Compensation Act can be traced to an act of the 1919 Alabama Legislature. At the time of its original enactment, a portion of the original Workers' Compensation Act provided that its provisions should "not be *Page 906 
construed or held to apply to any common carrier doing an interstate business while engaged in interstate commerce." That language was later codified at Ala. Code 1923, § 7543; Ala. Code 1940, tit. 26, § 263; and Ala. Code 1940 (Recomp. 1958), tit. 26, § 263. During the period when that exclusion constituted a part of Alabama's workers' compensation law, it was held that employees of a common carrier could not recover workers' compensation benefits for injuries arising out of and in the scope of their employment. See, e.g., Birson v. DecaturTransfer Storage, Inc., 271 Ala. 240, 122 So.2d 917 (1960).
Just under 30 years ago, the Legislature adopted Act No. 1062, 1973 Ala. Acts, which was titled, in pertinent part, "An Act . . . extending coverage to common carriers but specifying certain persons not to be employees of common carriers." Act No. 1062 repealed that portion of Ala. Code 1940 (Recomp. 1958), tit. 26, § 263, that exempted common carriers in interstate commerce from the Act. However, the Legislature did not impose blanket liability upon such carriers, because it also amended subsection (d) of Title 26, § 262, to read as follows:
 "The term `employer' as used herein shall mean every person not excluded by Section 263 of this title who employs another to perform a service for hire and to whom the `employer' directly pays wages . . . however not withstanding [sic] any section of articles 1 and 2 of this chapter, in no event shall a common carrier by motor vehicle operating pursuant to a certificate of public convenience and necessity be deemed the `employer' of a leased-operator or owner-operator of a motor vehicle or vehicles under contract to such a common carrier."
Thus, by amending the definition of the word "employer" in the Workers' Compensation Act, the Legislature, in effect, chose in 1973 to maintain the immunity afforded under the Act to common carriers in one particular situation, i.e., where common carriers have entered into contracts with owners of motor vehicles for the use of those vehicles. This portion of the definition of "employer" was recodified with the remainder of the Workers' Compensation Act, and now appears (with some slight stylistic changes) at § 25-5-1(4), Ala. Code 1975; it has remained substantively unchanged since its enactment in 1973. However, we are not aware of any cases in which the exception to common-carrier liability under the Act that now appears in § 25-5-1(4) has been addressed by this court or by the Alabama Supreme Court. See 2 Terry A. Moore, AlabamaWorkers' Compensation, § 30:23 n. 41 (1998) (stating that "[t]his exclusion has never been construed by the courts").
Nevertheless, as Alaplex notes in its appellate brief, Alabama is not alone in excluding common carriers from liability to owner-operators and leased operators under its workers' compensation laws. Our research has found that a number of states, including Colorado, Georgia, Iowa, Oklahoma, and Tennessee, provide for a general no-liability rule with respect to workers' compensation claims of owner-operators or leased operators against contracting common carriers. Colo. Rev. Stat. Ann. § 8-40-301(5) (West 2001); Ga. Code Ann. § 34-9-1(2) (1998 
Supp. 2001); Iowa Code § 85.61(13) (1995 Supp. 2001); Okla. Stat. Ann. tit. 85, § 3(6) (West Supp. 1997); Tenn. Code Ann. § 50-6-106(1)(A) (1999). Courts in most of these states have held that the legislative exclusion of common carriers from the definition of "employer," or the exclusion of an owner-operator or a leased operator from the definition of "employee" or "worker," will bar liability under workers' compensation *Page 907 
law. E.g., Scott v. Matlack, Inc., 1 P.3d 185, 188 (Colo.Ct.App. 1999),rev'd on other grounds, 39 P.3d 1160 (Colo. 2002); Upshaw v. HaleIntermodal Transp. Co., 224 Ga. App. 239, 480 S.E.2d 277 (1997); Youngv. Barbour Trucking Co., 856 P.2d 599, 600-01 (Okla.Ct.App. 1993); Longv. Stateline Sys., Inc., 738 S.W.2d 622, 623-24 (Tenn. 1985).
However, in only one state having an express owner-operator exclusion has the question of a common carrier's liability to agents of owner-operators been conclusively adjudicated by that state's highest court. In Long v. Stateline Systems, the Tennessee Supreme Court affirmed a summary judgment in favor of a common carrier on a claim brought under that state's workers' compensation law by a surviving spouse of a driver of a vehicle that had been leased by a common carrier from an owner-operator. In that case, the common carrier's "Equipment Lease Agreement" with the owner-operator specified that the owner-operator would be responsible for the costs of operation, including payments for injury or damage to operators or drivers and workers' compensation for operators or drivers. The pertinent Tennessee statute under review, like § 25-5-1(4), Ala. Code 1975, provided that "`no common carrier by motor vehicle operation pursuant to a certificate of public convenience and necessity shall be deemed the "employer" of a leased-operator or owner-operator of a motor vehicle or vehicles under a contract to such a common carrier.'" 738 S.W.2d at 623.
On appeal, the surviving spouse argued that the Tennessee statute did not exclude "employees" of owner-operators or leased operators. The Tennessee Supreme Court rejected that argument, noting that principles of statutory construction indicated that the terms "owner-operator" and "leased operator" should be given different meanings; that court held that the term "leased-operator must be construed to be a non-owner operating a vehicle pursuant to a lease agreement." 738 S.W.2d at 623. In addition, the Tennessee court concluded that the language of the pertinent statute "remov[ed] common carriers from consideration as the statutory employer o[f] an owner-operator or leased-operator." Id. at 624; accord, Joslin v. Michigan Mut. Ins. Co., 742 S.W.2d 263, 265
(Tenn. 1987) (workers' compensation plaintiff operating a truck owned by owner-operator and leased to common carrier holding certificate of convenience and necessity "was an employee of an owner-operator and was himself a leased operator" and "[i]n each of those capacities . . . was precluded from being" common carrier's employee).
Thus, both Long and Joslin belie the trial court's conclusion that Rossen "is neither a leased operator nor an owner operator." Furthermore, those cases support the proposition that where the Legislature manifests an intent to exclude common carriers entering into lease contracts with owner-operators from the class of employers subject to liability under a workers' compensation law, that intent may not be defeated by an owner-operator's mere delegation of driving duties to another driver, i.e., in the words of Long and Joslin, to a "leased operator." While Rossen is correct that this court has held that that portion of § 25-5-1(4) that generally defines an "employer" as one who pays wages "directly to" the person hired is not the sole basis for determining who is an employer (see American Tennis Courts, Inc. v.Hinton, 378 So.2d 235 (Ala.Civ.App. 1979)), the Legislature has, in this limited factual context, unequivocally foreclosed consideration of other factors by stating in § 25-5-1(4) that in no event shall a common carrier be deemed the "employer" of an owner-operator or a leased operator. *Page 908 
Based upon the foregoing facts and authorities, we conclude that the trial court's legal conclusion that Alaplex was Rossen's "employer" was erroneous. The remaining issues raised by Alaplex — whether Rossen's claim against Alaplex was barred by the doctrine of estoppel or by willful misconduct and whether Rossen suffered a permanent partial disability as a result of the collision made the basis of his claim — are moot. We reverse the trial court's judgment and remand the cause for further proceedings, to include the entry of a judgment in favor of Alaplex on Rossen's claims against it.
REVERSED AND REMANDED.
Yates, P.J., and Thompson, Pittman, and Murdock, JJ., concur.