THOMPSON, Judge.
B.S.H., C.L.H., and T.L.H., the children of C.H. (“the mother”) and T.H. (“the father”), were found dependent by January *1282 12, 2001, orders of the trial court. On November 20, 2001, the Etowah County-Department of Human Resources (“DHR”) filed petitions seeking to terminate the parental rights of the father and the mother to B.S.H., C.L.H., and T.L.H. (hereinafter collectively referred to as “the children”). On January 80, 2002, the trial court conducted a hearing at which ore tenus evidence was presented. On February 11, 2002, the trial court entered an order terminating the mother and the father’s parental rights to the children. The mother and the father appealed.
The mother was 40 years old and the father was 47 years old at the time of the hearing in this matter. The mother and father had never married, and both parents were unemployed. The record indicates that the mother has six children. The mother had three children, R.H., A.H., and W.H., with her former husband, and three children, B.S.H., C.L.H., and T.L.H., the three children involved in this ease, with the father. At the time of the January 30, 2002, hearing in this matter, B.S.H. and C.L.H., twin girls, were seven years old, and T.L.H., a boy, was six years old. The record indicates that DHR became involved with the parents in April 1995, when it received reports that the parents were using drugs and that the children were being neglected and abused.
Beverly Bankston, a social worker with DHR, testified that she worked with the family from January 2000 until July 2001. Bankston testified that the first meeting to develop an Individualized Service Plan (“ISP”) was held with the parents on February 15, 2000; at that time, the children were still in the custody of the parents. Bankston testified that the February 15, 2000, ISP required the parents to meet the children’s health needs, to refrain from using drugs, and to submit to random drug tests. According to Bankston, DHR also arranged for the family to receive counseling through Gadsden Psychological Services, a family counseling service used by DHR. Bankston testified that in April 2000, the father tested positive for drug use. Bankston stated that the parents had also failed to address some the children’s medical needs; the record indicates that many of the children’s teeth were rotten. According to Bankston, on April 21, 2000, because of the father’s positive drug screen and the parents’ neglect of the children’s dental health, DHR placed the children in the custody of the maternal grandmother. Bankston testified that at the time the children were placed in the maternal grandmother’s custody, the mother had not submitted to a drug test. The record indicates that the mother was asked to submit to a drug test in April 2000, but that she refused to do so.
Bankston testified that on April 28, 2000, the father tested positive for drug use and on May 1, 2000, both parents tested positive for drug use. The record indicates that, during the same time frame, the maternal grandmother returned the children to the parents on two occasions. Bankston testified that because of the maternal grandmother’s failure to abide by the custody arrangement, DHR placed the children in the custody of C.P., the father’s stepdaughter from a previous marriage. The record indicates that DHR received reports that C.P. was also failing to abide by the custody arrangement. According to Bankston, on June 13, 2000, which was a Tuesday, C.P. informed DHR that the mother had taken the children from her home for the weekend and that she had not returned them. Bankston testified that during the summer and fall of 2000, DHR held several meetings with the parents stressing the necessity to comply with the requirements of the ISP, that the parents failed to show up at meetings with DHR and at counseling sessions, that *1283 DHR continued to receive reports that the parents were using drugs, and that the parents continued frequently to test positive for drug use.
On October 3, 2000, Bankston testified that she received a report from Brantley Bishop, a narcotics task force officer, that the task force had raided the parents’ mobile home and that, during the raid, he had found drug paraphernalia inside the home. Bankston testified that Bishop stated that the parents’ home was “filthy,” and that there were many roaches in the house. According to Bankston, she inquired about the condition of the home during a subsequent visit with the children. Bankston testified that the children informed her that they were sleeping on a mattress on the living room floor and that they did not like living with roaches in their home. Bankston testified that she arranged for the health department to inspect the parents’ home. According to Bankston, she notified the parents of the inspection and informed them that they had two weeks to clean their home before the inspection.
James Kelly from the Etowah County Health Department inspected the parents’ mobile home on November 30, 2000. Kelly’s report regarding that inspection is contained in the record on appeal. That report stated that the windows of the home were broken and covered with cardboard, that the only source of electricity for the home was provided by a generator, that the home had no source of hot water, that the carpet in the home was black with filth, that the surfaces in the kitchen had accumulations of food waste, that a large number of roaches were in the kitchen, and that garbage was piled around the outside of the home. Kelly stated that he found the mobile home “to be in a deplorable state of filth” and that it was “unfit for human habitation.” The record indicates that the mobile home was condemned in July 2001.
Bankston testified that all three children’s teeth were rotten, and that DHR had consistently informed the parents that the children needed to be taken to the dentist. Bankston testified that she asked the mother about the children’s dental treatment at a meeting regarding the ISP in November 2000. Bankston testified that the mother informed her that the children had seen Dr. Day, a dentist in Gadsden. Bankston stated that when she attempted to confirm that the children had seen Dr. Day, an employee with Dr. Day’s office stated that the office had no record of the children ever having been treated by Dr. Day. According to Bankston, she confronted the mother with the information and the mother informed her that the children saw a dental hygienist at Dr. Day’s office and that they did not see Dr. Day. Bankston testified that she again contacted Dr. Day’s office and that an employee from Dr. Day’s office stated that if the children had seen a hygienist in Dr. Day’s office they would also have seen Dr. Day and that Dr. Day’s office would have records on the children; the employee from Dr. Day’s office continued to assert that the children had not visited the office and that the office did not have records on the children.
In January 2001, DHR petitioned for and obtained custody of the children. Bankston testified that when she went to the parents’ home to retrieve the children, the mother and the children hid inside the home and would not come out and that the father eventually convinced the mother to allow DHR to take the children. The children were placed in foster care. Bankston testified that the children’s grades in school improved after they were placed in foster care. Bankston testified that after the children were placed in foster care, *1284 DHR arranged for the children to receive dental treatment. The record indicates that the children were eventually treated by an oral surgeon. Bankston testified that T.L.H. had 15 of his teeth removed and that B.S.H. and C.L.H. each had 10 to 11 teeth removed. Bankston testified that a fellow DHR employee informed her that following a visit with her mother, B.S.H. told the worker that the mother had told the child that the reason the children were in foster care was because B.S.H. talked too much.
Bankston testified that another ISP meeting was held with the parents on January 15, 2001. According to Bankston, the ISP developed at that meeting required the parents to clean their home, establish garbage service, participate in a counseling program, and submit to random drug tests. Bankston testified that the parents established garbage service in February 2001, but that they failed to pay for the service in April, May, and June 2001 and that the service was then discontinued. Bankston testified that she had contacted Alabama Power Company, an electric utility, about reestablishing electric service for the family, but that Alabama Power would not reestablish service because the parents had overdue electric bills in excess of $700 and the father had tried to “jump” Alabama Power’s power lines, i.e., bypass the electric meter, on several occasions. Bankston testified that on February 8, 2001, the father once again tested positive for drug use.
Bankston testified that in June 2000 DHR referred the family to academic and personal support services (hereinafter APSS), an agency that provides in-home support to families referred by DHR. Del Rainey, the director of APSS, testified that APSS provided counseling in parenting skills to the mother and the father, provided family support services, and assisted the mother and father in budgeting. Rai-ney testified that APSS also provided the parents with cleaning supplies and instructed the parents in how to improve the conditions of their home. The parents submitted to drug screens through APSS. Rainey testified that the parents did not consistently show up at the times scheduled for the drug screens. Rainey testified that on one occasion, before DHR obtained custody of the children in January 2001, the mother informed him that she had made dental appointments for the children. Rainey testified that he attempted to confirm the appointments, but that an employee from the dentist’s office stated that no appointments had been made. Rainey testified that APSS stopped providing in-home service to the family in July 2001 because the parents continued to have positive drug screens, because APSS staff members reported that they did not feel safe in the family’s residence, because the parents refused to cooperate with APSS, and because of the parents’ lack of progress. Rainey stated that although APSS discontinued in-home service, APSS continued to provide drug screening to the parents.
Bankston testified that DHR met with the family on July 2, 2001, and that at that meeting, DHR informed them that because of their failure to comply with the ISP and because of their lack of progress, DHR was turning the family’s case over to DHR’s permanency unit. Bankston testified that she explained to the mother and the father that DHR was working on a concurrent plan in which it would work toward reunifying the children with the parents while making preparations for the termination of the parents’ parental rights in the event such reunification was not possible.
Carrie Ayers, a DHR permanency unit caseworker, testified that she took over *1285 the family’s case in July 2001. Ayers testified that after she received the case, the parents moved frequently and failed to notify her of their new addresses. Ayers testified that since she began working with the family, the parents visited the children twice per month during the summer of 2001 and once per month when the children began school in the fall of 2001. According to Ayers, the children’s behavior became erratic and aggressive following visits with and telephone calls from the parents. Ayers testified that the children informed her that they did not want to visit with the mother and the father. Ayers testified that the DHR employee who transports the children to and from visits with the parents stated that on one occasion when she was returning the children from visiting the parents, the children informed her that the parents were planning to kidnap them from the children’s foster home and that the parents had told the children to run away from the foster home on a particular day and to go to a particular location where the parents would pick them up. Ayers testified that the children’s foster mother informed her that she had been contacted by the police because the parents had used a stolen telephone calling card to telephone the children at the foster parents’ home.
Ayers stated that from the time she began working with the family in July 2001 until the time of the hearing in this matter, the parents missed numerous drug-screen appointments and frequently tested positive for drug use. Ayers testified that she spoke with the mother in person and mailed the mother a letter suggesting that the mother seek treatment for her drug addiction. Ayers testified that she also suggested that the mother apply for Medicaid at the local Social Security office in order to obtain health insurance that would pay for her to enter a drug-treatment facility. Ayers testified that there were also free drug-rehabilitation treatment options available. According to Ayers, the mother did not seek treatment, and the mother continued to deny that she had a drug problem.
Ayers testified that she made efforts to obtain additional services for the parents after she was assigned to the case, but that she had difficulty because of the parents’ past noncompliance. Ayers testified that she contacted Gadsden Psychological Services to inquire about renewing the parents’ counseling sessions, but that an employee there informed her that because of the parents’ numerous missed appointments and their failure to follow through with recommendations of their counselor, Gadsden Psychological Services was not willing to reestablish a relationship with the parents. Ayers stated that she also contacted APSS, but that that agency was not willing to reestablish in-home service because the parents frequently moved without notifying DHR or APSS of their new address, and because of the parents’ history of noncompliance with recommendations made by APSS.
Ayers testified that the children’s foster mother informed her that B.S.H. had shown her how to roll a dollar bill and use it to snort cocaine. Ayers stated that the foster mother informed her that the child had stated that she learned how to use the dollar bill in such a manner while she was with her parents. Ayers testified that the children’s counselor informed her that B.S.H. had also given the counselor explicit details on how to have sex and how to please your sexual partner.
Ayers testified that DHR considered several relative placements for the children, but that those relatives were either unwilling to care for the children or DHR determined that the individual was not a suitable relative resource. Ayers testified *1286 that she was aware that the parents had obtained a new residence a few weeks before the hearing, but that DHR had not had time to inspect the home before the hearing. Ayers stated that she recommended that the parents’ parental rights be terminated.
The mother testified that her husband died in 1991; that she currently receives $1,196 per month in insurance benefits from his death; and that she had been unemployed since his death. At the beginning of her testimony, the mother stated that she was diagnosed with cervical cancer in 1991, that her doctor told her that she would not die from the cancer, and that she had not sought employment since 1991 because of her illness. The mother also stated that she had not sought employment because she had borne three children since 1991. The mother later testified that she had not sought employment because she suffers from epileptic seizures, which, the mother stated, she began having in 2000.
The mother admitted that she had tested positive for drug use during the period DHR was involved with the family. At the beginning of her testimony, the mother asserted that she did not have a problem with drugs. The mother testified that she had not smoked marijuana in three months and that she had not used methamphet-amines since December 2001, the month before the January 30, 2002, hearing in this matter. Toward the end of her testimony, the mother testified that she had had a drug problem until six weeks before the hearing in this matter, but that she had gotten herself off drugs. When questioned as to why she continually denied having a drug-use problem during the two years DHR was involved with the family, the mother stated that most people who are addicted to drugs deny their addiction. At the time of the hearing, the mother also stated that she would like DHR to send her to a drug-treatment facility. The mother denied receiving a letter from Ayers with names and contact numbers for drug-treatment facilities. The mother testified that the father received paperwork from DHR in February 2000 about entering a state-sponsored drug-rehabilitation program, but that he had not sought treatment. The mother testified that the father had used illegal and prescription drugs but had stopped using drugs six months before the January 30, 2002, hearing. The record indicates that the parents lived in five residences in the six months before the hearing. The mother testified that she and the father had separated in October 2001, but that they had resumed their relationship at the time of the hearing. The mother testified that she and the father moved into their current residence on January 4, 2002. The mother testified that the family moved frequently in an effort to “stay off drugs.”
The mother testified that at the time of the hearing she was aware of only one outstanding warrant for her arrest. The mother stated that the warrant had been issued in Boaz; that she had been arrested there for possession of drug paraphernalia; that a hearing on that charge was scheduled in December 2001; and that she had failed to appear at the hearing. The mother testified that the charge with regard to that case was still pending at the time of the January 30, 2002 hearing. Upon further questioning, the mother testified that she had also been arrested for writing checks for which there were insufficient funds and that she had failed to show up for two scheduled hearings related to that arrest;[1] the record indicated that the *1287 mother also had an outstanding warrant for her arrest in Blount County related to the worthless-check charge at the time of the hearing in this matter.
The mother testified that for the one and one-half years that APSS provided services to the family, Rainey would come to the family’s house once every two weeks and that “Vic”, a counselor from APSS, came to the parents’ home every week. The mother testified that Rainey and Vic would just sit and talk with the family and that Rainey and Vic did not provide any services to the family. The mother- testified that she was not provided cleaning supplies until January 2001; however, the mother also testified that she had the funds available to purchase cleaning supplies. The mother testified that she had sought assistance from DHR in paying the electric bill.
The mother admitted that relatives who were supposed to be caring for the children had returned the children to her and the father in violation of the DHR ISPs on several occasions. The mother testified that she threatened to kill Bankston when Bankston came to her home to take custody of A.H.’s second child, the mother’s grandchild.[2] The mother testified that she asked DHR to assign the family a new caseworker.
The record indicates that R.H., A.H., and W.H., the mother’s three children with her deceased husband, had been involved with the Alabama Department of Youth Services (“DYS”). The mother testified that both W.H. and A.H. had used illegal drugs, but that neither child had used drugs in her home. The mother testified that she did not feel that the older children’s behavior problems were a reflection of her ability to parent. The mother stated that she believed A.H. and W.H. were a bad influence on her children and that the family had moved often to stay away from A.H. The mother testified that W.H. was in the custody of DYS at the time of the hearing in this matter.
The father testified that he had been unemployed since 1992 when he suffered a back injury in a motorcycle accident. The father testified that he received $548 per month in Social Security disability payments as a result of that accident. The father testified that in July 2001, he had stopped taking pain medication that had been prescribed for him. The father testified that he had not used methamphet-amines since September 2001. The father testified that since September 2001 he “may” have taken “pain pills.” The father admitted that he had “jumped” the power from one of Alabama Power’s power lines to the mobile home to avoid paying for electricity. The father testified that at the time of the hearing in this matter he had criminal charges pending against him for writing cheeks for which there were insufficient funds.
A.H., the mother’s child from her former marriage, testified that she currently lived with the mother and the father. A.H. stated that she had a ninth-grade education; that she was not enrolled in school; and that she did not work. According to A.H., she received a check in the amount of $277 per month; the record indicates that the amount is related to the death of her father. A.H. testified that she used *1288 the funds to assist with the parents’ utility and grocery bills. A.H. testified that she had two children and that the father of her youngest child was in prison. A.H. stated that she and the youngest child’s father are no longer involved in a relationship. According to A.H., the child’s father sold drugs before his incarceration, but she was unsure that he would resume selling drugs when he was released from prison. A.H. stated that the father of her youngest child had informed her that he intended to seek custody of that child upon his release from prison and that she felt the child would be better off with his father. A.H. testified that she had not used illegal drugs since December 2001, the month before the January 30, 2002, hearing in this matter.
Carla Handy, the guardian ad litem for the children, testified that she recommended that the parents’ parental rights be terminated.
In addition to the facts stated above, the trial court made the following specific findings of fact in its February 11, 2002, order:
“B.S.H., C.L.H., and T.L.H., are the children of C.H. and T.H. These children have been in the temporary custody of [DHR] since on or about January 11, 2001, and have resided in foster care continuously since being placed in [DHR]’s custody. [DHR] worked with this family approximately one year prior to January of 2001 in an effort to prevent the removal of the children from the home. During the year prior to the children’s removal from their home, [DHR] arranged several different safety plans with various extended family members to care for the children because of reports received by [DHR] alleging abuse/neglect of the children by the parents. These safety plans failed when the people who were supposed to be caring for the children returned the children to the parents without notifying [DHR], [DHR] offered the family assistance in the form of individual counseling (both in home and out of home), family counseling, drug screening, drug counseling, and transportation.
“Despite all of these services offered by [DHR], the parents’ situation did not improve. The parents continued to receive positive drug screens and did not cooperate in obtaining dental treatment for the children. An Inspector from the Health Department determined that the parents’ home was unfit for human habitation and posed immediate danger to the health of the occupants. [DHR] petitioned for and obtained temporary custody of the children in January of 2001. The children were placed in foster care.
“Since January 2001, the parents have made little or no progress under the terms of their Individualized Service Plan (ISP). They moved several times and did not keep [DHR] informed of their whereabouts. Both parents have been arrested and incarcerated on more than one occasion since January of 2001 and have unresolved criminal charges pending against them at this time. Both parents continued to test positive for drugs. After the children were placed in foster care, [DHR] arranged for them to be treated by a dentist. All three children ultimately had numerous baby teeth removed due to their poor condition. Neither parent is working at this time, although the father receives Social Security Disability.
“There are no relatives who are suitable, appropriate and viable placement resources for these children. [DHR] conducted a home study of the children’s paternal aunt, [F.M.]; however, [F.M.]’s home was not approved. Prior to the children being placed in foster care, safety plans were attempted with the maternal grandmother, [J.M.], and the *1289 children’s older half sister, [C.P.]. As noted above, those plans failed when the children were sent back to the parents without [DHR]’s knowledge. C.H.’s older daughter, [R.H.], informed [DHR] that she could not be a resource for these children because of having to care for her own children. [DHR] also contacted T.H.’s brother and sister-in-law, [B.He. and C.He.]. [B.He. and C.He.] advised [DHR] that they would not be able to care for these children in their home.
“After consideration of the evidence herein, and after a hearing thereon, the court finds by clear and convincing evidence as follows:
“1. B.S.H., C.L.H., and T.L.H., are children under sixteen (16) years of age and are residents of or physically located in Etowah County, Alabama;
“2. The mother ... and the father ... are unable or unwilling to discharge their responsibilities to and for these children;
“3. The conduct or condition of the mother ... and the father ... is such as to render them unable to properly care for these children and such conduct or condition is unlikely to change in the foreseeable future; and,
“4. These children are dependent, there are no viable relative resources, and there is no viable alternative other than termination of parental rights.”
On appeal, the mother and the father assert that the trial court erred in terminating their parental rights. A trial court’s determination of factual issues following the presentation of ore tenus evidence is presumed correct and will not be disturbed on appeal absent a showing of palpable error. F.L.L. v. State Dep’t of Human Res., 612 So.2d 501 (Ala.Civ.App.1992). In addition, this court has stated:
“Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent’s custody would be in the best interests of the child. M.H.S. v. State Dep’t of Human Resources, 636 So.2d 419 (Ala.Civ.App.1994).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26 — 18—7(b), Ala.Code 1975.’
“M.H.S. v. State Dep’t of Human Resources, 636 So.2d at 421.
“Where a nonparent petitions to terminate a parent’s parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child depen *1290 dent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the 'trial court’s determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep’t of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id.”
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
Both parents admitted to using illegal drugs within the few months preceding the January 30, 2002, hearing. The record indicates that although both the mother and the father frequently tested positive for drug use during the two years DHR has been involved with the family, both parents have failed to seek treatment for their use of illegal drugs. The mother testified that R.H., A.H., and W.H., the mother’s three other children, had been or are currently involved with the Department of Youth Services. A.H. testified that she was living with the parents at the time of the hearing and that she had used drugs as recently as the month before the hearing. The record indicates that the parents were consistently unwilling or unable to meet the requirements, including the requirement that they seek treatment for the children’s dental needs, of the numerous ISPs developed in their case. In addition, the record indicates that DHR was unable to find a suitable relative resource placement for the children. Therefore, given the overwhelming evidence in the record on appeal, this court concludes that the trial court did not err in terminating the mother’s and the father’s parental rights to the children. See A.R.E. v. E.S.W., supra.
AFFIRMED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.

. The record indicates that the mother failed to appear at the first hearing related to her *1287 arrest for writing worthless checks; that the trial court issued a warrant for the mother's arrest; that the mother was arrested; that the trial court gave the mother a second chance and set another hearing on the charge; and that the mother failed to appear at the second hearing. The current warrant in that matter is related to the mother's failure appear at the second hearing.

. At the time of the hearing, A.H. was 17 years old and had two children.