919 So.2d 1197 (2005)
D.M. and M.M.
v.
WALKER COUNTY DEPARTMENT OF HUMAN RESOURCES.
C.W.H.
v.
Walker County Department of Human Resources.
P.H.
v.
Walker County Department of Human Resources.
2040107, 2040108, and 2040109.
Court of Civil Appeals of Alabama.
July 8, 2005.
*1199 Nath T. Camp, Jr., Jasper, for appellants D.M. and M.M.
John Wesley Trice, Jasper, for appellant C.W.H.
Bryon McMath, Jasper, for appellant P.H.
Troy King, atty. gen., and Lynn S. Merrill and Elizabeth L. Hendrix, asst. attys. gen., Department of Human Resources, for appellee.
PER CURIAM.
C.W.H. ("the mother") and P.H. ("the father") appeal from a judgment terminating their parental rights to their two sons, four-year-old B.H. and two-year-old M.H. The children's maternal great aunt and great uncle, M.M. and D.M. (hereinafter referred to as "the aunt" and "the uncle," respectively), appeal from the same judgment, which also denied a joint petition in which the aunt and the parents had sought custody of the children.
The record on appeal and the testimony elicited at a September 13, 2004, final hearing in this matter revealed the following facts and procedural history. The Walker County Department of Human Resources ("DHR") became involved with the family in 2001 when DHR received a child abuse/neglect report regarding the parents' care of B.H., who was 14 days old at that time. The testimony presented at the September 13, 2004, final hearing did not indicate whether DHR determined whether that report had merit.
Tracy Norwood, a DHR social worker, became involved with the family on an *1200 ongoing basis in October 2002.[1] At that time, she investigated an incident in which B.H.'s safety had been jeopardized when the mother and father engaged in a physical altercation while the mother was holding B.H. That incident resulted in the father's arrest on a charge of domestic violence; the father was later convicted on that charge. Norwood devised a safety plan on October 22, 2002, requiring the mother and B.H. to live with a relative and to stay away from the father until DHR could implement services for the family. The mother agreed to the safety plan but violated its terms only three days later, on October 25, 2002, by leaving her relative's home and walking in the rain to meet the father with B.H., who was then approximately 16 months old. Subsequently, with the mother's consent, DHR placed the child in a temporary shelter and later with another relative of the mother's.
Both parents have limited intellectual functioning. The father's IQ is in the 60s; the evidence pertaining to the mother's IQ indicated that it was in the range of the 70s to the mid-80s.
DHR provided the parents with parenting classes, psychological evaluations, and housekeeping and hygiene training approximately two to three times per week. In addition, DHR provided financial services, including the payment of rent and utilities, and arranged for people in the community to donate various household items to assist the parents in furnishing their home. Norwood testified that the parents were initially very cooperative with DHR and that they completed the parenting classes, participated in psychological evaluations, and were referred to counseling.
B.H. was returned to the parents' custody approximately one week before the mother went into premature labor with her second child, M.H., who was born on December 12, 2002. M.H. spent almost two months in the hospital after his birth. After observing the interaction between the parents and their premature infant son, hospital personnel recommended to DHR that M.H. not be released into the parents' care.
Norwood initially contacted the aunt and uncle about whether they might provide a home for M.H. upon his release from the hospital because of his medical condition and his specialized health-related needs. During the time that M.H. was in the hospital following his birth, DHR received another report concerning B.H.; in January 2003, while unsupervised, B.H. had been burned when he fell against a heater. During the same time period, the father was arrested for nonpayment of a fine imposed pursuant to his 2002 conviction on the domestic-violence charge. On January 19, 2003, before M.H. was released from the hospital, Norwood asked the aunt and uncle to take B.H., and the aunt and uncle agreed to do so. On February 4, 2003, M.H. was released from the hospital into the care of the aunt and uncle. Following a May 19, 2003, hearing, the juvenile court determined on June 10, 2003, that the children were dependent and awarded custody of them to the aunt and uncle.
Norwood testified that throughout the summer of 2003, both the aunt and the *1201 uncle had often expressed doubts about whether they could provide long-term care for the children. On September 23, 2003, in response to the aunt and uncle's requests that the children be removed from their home, DHR petitioned the juvenile court for custody of the children. Following a hearing, the juvenile court determined that the children were dependent, awarded legal custody to DHR, ordered that the parents receive one hour of weekly visitation with the children, and set the case for a permanency hearing. The children were placed with a foster mother whose husband was deployed overseas in military service. DHR asked the aunt to assist the foster mother in caring for the children; according to the aunt, she did so by keeping the children for the foster mother three or four times. The children were in that initial foster-care placement for only a couple of weeks.
Following that initial foster-care placement, the children were placed with another family for approximately a week while a DHR social worker attempted to locate a more permanent placement. According to the aunt, she asked that the children be returned to her home at that time, but she stated that DHR refused to do so. On October 25, 2003, the children were placed with their present foster parents, R.V. and A.V.
On October 16, 2003, the aunt and uncle moved to set aside the court's dependency order, alleging that they had not received notice of the permanency hearing and seeking to be heard in the matter. The juvenile court denied the motion on October 23, 2003, noting that the case was before it "to determine future plans of permanency" and concluding that
"after reviewing all the documents, reviews, and hearing the testimony of qualified social work staff at [DHR], [DHR] ha[s] made every effort to work with this family to rehabilitate and work toward reunification, to consider relative resources, and provide all available services to avoid the minor children coming into foster care. Therefore, the Court finds that [DHR] has exhausted all possible efforts to work with this family for reunification and is excused from working with this family and excused from providing any further services. It is the recommendation of the Court that [DHR] continue to finalize their plans for permanency."
The mother filed a motion for a new trial; the juvenile court denied that motion.
On November 10, 2003, the aunt and uncle filed a petition seeking to intervene; on that same date, they also filed a petition seeking custody of the children. The juvenile court conducted a hearing on the aunt and uncle's petition for custody of the children. On February 3, 2004, the juvenile court entered an order in which it did not specifically rule on the motion to intervene, but in which it denied the aunt and uncle's petition for custody of the children. In that order, the juvenile court reiterated the findings it made in the October 23, 2003, order and stated that the best interests of the children would be served by the termination of the parents' parental rights so that the children might be adopted. The aunt and uncle moved the juvenile court to alter, amend, or vacate the February 3, 2004, order denying their petition for custody of the children; the juvenile court denied that motion.
On April 14, 2004, the mother, the father, and the aunt filed a joint petition for custody and immediate visitation with the children; the uncle was not a party to that petition. Two days later, DHR filed a petition to terminate the parents' parental rights to the children. On September 13, 2004, the juvenile court held a hearing on DHR's petition and on the joint petition *1202 for custody and visitation filed by the parents and the aunt. In addition to the facts and procedural history already set forth in this opinion, the evidence presented at that hearing reveals the following.
The parents have a history of frequent separations. The mother testified that during their four-year marriage, the parents had separated on one occasion for three months and on another occasion for nine months. The parents also have a history of using poor judgment with respect to financial-management issues. For example, a great deal of testimony concerned the parents' practice of acquiring rent-to-own entertainment items such as video-game players, big-screen televisions, and videocassette recorders instead of paying their rent, utilities, and municipal court fines, or providing for their children. The evidence indicated that the parents had failed to pay utility bills and that, at one point, a relative acquired electric service for the parents' home in his name. Further, Norwood testified that "there was always minimal or limited food in the [parents'] house." Norwood also described an incident in which she had helped the mother become recertified for the WIC[2] food program and had taken her grocery shopping, after which, Norwood learned, the mother gave a gallon of milk she had just purchased for B.H. to a neighbor.
During the seven months that the children were in the custody of the aunt and uncle, the father visited them weekly, often riding his bicycle to travel to the aunt and uncle's home. The mother visited the children only sporadically and sometimes as much as two to three months passed between the mother's visitation with the children. According to Norwood, although the father visited regularly with the children and played with them appropriately, he was unable to direct or discipline the children. Norwood acknowledged that the father had completed parenting classes, but she stated that those classes did not improve the father's ability to properly parent the children.
After the juvenile court's October 23, 2003, order authorizing DHR to proceed with permanency planning for the children, DHR did not schedule visitation for the parents or the aunt and uncle. The mother testified that on one occasion shortly after the entry of the October 23, 2003, order, she contacted Norwood in order to arrange visitation. According to Norwood, she told the mother to contact Kristie Alexander, the social worker then in charge of the case. Alexander testified at the September 13, 2004, hearing that the parents had not contacted her to arrange visitation and that she had had no contact with the aunt and uncle since October 2003. When asked why DHR made no further attempt to reunite the family, Alexander indicated that at the time she began working on the case, DHR's intention was to pursue the termination of the parents' parental rights.
At the September 13, 2004, hearing, the mother testified that, after several previous separations, she and the father had been back together for one and a half years. The parents lived with the aunt and uncle for approximately four and a half months, but they moved out of that home approximately six months before the hearing in this matter. The mother stated that, for the five or six months preceding the hearing, she and the father had been preparing to live in a two-bedroom mobile home that they had recently purchased. *1203 The father testified that he and the mother had purchased the mobile home with the proceeds of a settlement from a work-related automobile accident in which he had been involved. The mobile home was located on three or four acres of land that the parents had rented and for which they had prepaid the rent for two years. At the time of the hearing, however, the parents had been living in the mobile home for only four weeks. There is no evidence in the record concerning where the parents lived between the time they moved from the aunt and uncle's house and the time they moved into the mobile home; the aunt testified that she did not know where the parents had lived during that time.
The mother testified that she has asthma but that medication controls that condition. Although she has worked in the past, at the time of the September 13, 2004, hearing, the mother was unemployed. The mother has a driver's license and a vehicle.
The mother testified that the father is employed by a tile company in Birmingham and earns between $300 and $360 per week; he rides to work each day with his brother. The mother testified that she paid the parents' bills with money given to her by the father. According to the mother, at the time of the hearing, the parents had no rent-to-own items. In response to specific questioning, the mother testified that they had used the father's most recent paycheck to purchase groceries, to make a payment on her vehicle, and to put gasoline in the vehicle. The mother acknowledged that the mobile home in which they were living had no electric service and that the parents had been keeping food in a relative's refrigerator. However, according to the mother, the electric service would be connected within a few days of the hearing when the power company "set the pole" to provide that service.
Both children are special-needs children and require close supervision. B.H. is developmentally delayed, with social, cognitive, and speech impairments. B.H. has a very short attention span and behavioral problems, including hyperactivity and defiance. For the first year after his birth, M.H. was classified as "medically fragile," and he was required to use a sleep-apnea monitor at night. At the time of the final hearing, M.H.'s health had improved; he, like his brother, suffers from asthma and requires medication for that condition. The children have received various forms of educational therapy to address their developmental delays. The foster parents have worked with the children at home and the children have made good progress.
The mother testified that she had been in DHR custody since she was six weeks of age and that she did not want her children to be adopted by strangers. She said that if she and her husband could not have custody of the children, she wanted her aunt and uncle to have custody.
The aunt and the uncle, who are 51 and 54 years old, respectively, have been married for over 30 years. The aunt testified that she has worked as a sitter for the elderly but that she is currently unemployed because she does not want to work. According to the aunt, the uncle is disabled and receives disability benefits because of "something to do with his back." The uncle, however, explained that although he had suffered a back injury, his disability was attributable to a nervous breakdown he suffered in 1986.[3]
*1204 The aunt and uncle live in a five-bedroom, four-and-a-half-bath home. In the past, they have been licensed foster parents for other children, including severely handicapped and "medically fragile" children. At the time they agreed to care for B.H. and M.H., the aunt and uncle were not licensed foster parents. They did, however, receive training from the hospital staff regarding how to care for M.H. when he was released from the hospital after his birth. Norwood testified that the aunt and uncle loved the children and did an excellent job of caring for them during the time the children were in their care.
Norwood testified that throughout the summer of 2003 both the aunt and the uncle had often expressed doubts about whether they could provide long-term care for the children and that they repeatedly requested that the children be removed from their home. The aunt testified at the September 13, 2004, hearing that she and the uncle had suffered from the effects of stress and sleep deprivation due to the fact that M.H.'s sleep-apnea monitor sounded continually during the night. In addition, the aunt told Norwood that her husband was having "nerve problems."
The aunt has a history of seizures. Norwood testified that the aunt informed her that she had started having what the aunt believed were seizures again when the children were placed with her. The uncle testified that the aunt only passed out once or twice. According to Norwood, the aunt reported to her that on one occasion she believed she had suffered a seizure and had fallen from a porch swing while holding M.H. However, the aunt testified that "she had not had any problem" during the incident involving the fall from the swing, that the incident in the swing occurred when the swing broke and fell, and that her doctors had told her that the purported seizures were merely incidents in which her "blood sugar had bottomed out."
The aunt and the uncle testified that they asked that the children be removed from their home because of stress to the uncle and because of sleep deprivation caused by the youngest child's need for a sleep-apnea monitor. The aunt also testified that because she was having what she believed were seizures, she was worried about her ability to safely provide care for the children. According to the aunt, Norwood informed her that "if she [got herself] checked out and . . . [she was] not having seizures, [DHR] would place the kids back in [her] home." The aunt testified that she informed Norwood that a physician had diagnosed her as suffering from low blood sugar rather than from seizures and that, at the time the children were leaving their initial foster-care placement in October 2003, she had requested that the children be returned to her home. The aunt testified, however, that DHR denied her request to have the children placed with her again and that a member of the DHR social-work staff recommended that the aunt and uncle "go back through the courts."
The uncle testified that he and his wife were willing and able to provide for the children with no assistance from the State. He listed the antidepressant medications that had been prescribed for him, as well as a medication for hyperactivity, and stated that he had no health problems that would keep him from being able to raise the children.
On September 29, 2004, the trial court entered its judgment denying the joint petition for custody filed by the mother, the father, and the aunt and granting DHR's petition to terminate the mother's and the *1205 father's parental rights. That judgment recites the procedural history of the case and makes various conclusions, among which are the following:
"1. That the Joint Petition for Custody and Visitation filed on behalf of [the aunt, the mother, and the father] shall be denied. The parental rights of [the mother and the father], parents of the minor children [B.H.] and [M.H.], shall be terminated pursuant to the Code of Alabama § 26-18-7 et seq.
"2. That [DHR] has made reasonable efforts to finalize the permanency plan of adoption. It is in the children's best interest that they be placed in the permanent custody of the State [DHR] for the purpose of adoption."
The aunt and uncle filed a motion to alter, amend, or vacate the juvenile court's September 29, 2004, judgment, as did the mother. The juvenile court denied those motions. The mother and the father each filed a notice of appeal, and the aunt and the uncle together appealed.

Standing
We initially examine the issue whether the aunt and the uncle have standing with regard to this appeal. Standing is a jurisdictional issue that may be considered by an appellate court ex mero motu. E.V.W. v. Jefferson County Dep't of Human Res., 893 So.2d 1212 (Ala. Civ.App.2004); Alaplex Transp., Inc. v. Rossen, 836 So.2d 901, 905 (Ala.Civ.App. 2002).
"Standing . . . turns on `whether the party has been injured in fact and whether the injury is to a legally protected right.' Romer v. Board of County Comm'rs of the County of Pueblo, 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting) (emphasis added). See also NAACP v. Town of East Haven, 892 F.Supp. 46 (D.Conn.1995). `One has standing to bring his complaint into court "if his stake in the resolution of that complaint assumes the proportions necessary to ensure that he will vigorously present his case.'" Smith v. Potts, 293 Ala. 419, 422, 304 So.2d 578, 580 (1974) (emphasis added)."
State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1027-28 (Ala.1999).
With regard to standing, our supreme court has also held:
"`Unless a person is a party to a judgment, he can not appeal from that judgment. That fundamental principle is one of the oldest in Alabama jurisprudence.' Daughtry v. Mobile County Sheriff's Dep't, 536 So.2d 953, 954 (Ala. 1988). `One must have been a party to the judgment below in order to have standing to appeal any issue arising out of that judgment.' Mars Hill Baptist Church of Anniston v. Mars Hill Missionary Baptist Church, 761 So.2d 975, 980 (Ala.1999) (emphasis added). See also Triple J Cattle, Inc. v. Chambers, 621 So.2d 1221 (Ala.1993)."
Boschert Merrifield Consultants, Inc. v. Masonite Corp., 897 So.2d 1048, 1051-52 (Ala.2004).
The uncle was not a party to the April 14, 2004, joint petition for custody filed by the mother, the father, and the aunt. In its September 29, 2004, judgment, the juvenile court denied the joint petition; in doing so, the juvenile court identified only the three parties to that petition. Although he was a party to earlier proceedings before the juvenile court, the uncle was not a party to the proceedings from which his and the aunt's appeal is taken. We therefore dismiss the appeal as to the uncle due to lack of standing.
In her brief on appeal, the aunt has not argued that the juvenile court erred in denying the April 14, 2004, joint petition *1206 for custody to which she was a party. Rather, the aunt argues issues that pertain only to the propriety of that part of the juvenile court's September 29, 2004, judgment in which the court ordered that the parents' parental rights be terminated.[4] However, the aunt has no legally protected parental right with regard to the children at issue. See State v. Property at 2018 Rainbow Drive, supra. Further, the aunt may not assert arguments on behalf of the parents.
"`"[A] litigant may not claim standing to assert the rights of a third party."' Ex parte Izundu, 568 So.2d 771, 772 (Ala.1990) (quoting Jersey Shore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 417 A.2d 1003 (1980)). `A party lacks standing to invoke the power of the court in his behalf in the absence of a "concrete stake in the outcome of the court's decision."' 568 So.2d at 772 (quoting Brown Mech. Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 937 (Ala.1983))."
Lott v. Eastern Shore Christian Ctr., 908 So.2d 922, 932 (Ala.2005). We conclude that the aunt lacks standing to prosecute the issues raised in her brief on appeal; therefore, we must dismiss her appeal. Goodyear Tire & Rubber Co. v. Moore, 900 So.2d 1239 (Ala.Civ.App.2004).
The remaining two appeals in this caseby the mother and by the fatherhave in common the following two issues: (1) whether DHR presented clear and convincing evidence that the parents were unable or unwilling to discharge their responsibilities to the children; and (2) whether the juvenile court failed to consider the aunt and uncle as a viable alternative to the termination of parental rights. In addition, the mother's appeal raises an issue not raised by the father's appeal, namely: that the juvenile court erred by terminating parental rights without specifically finding that the children continued to be dependent at the time of the termination proceeding. The father's appeal raises the following issues not raised by the mother's appeal: that the juvenile court erred by not perfecting service on him before determining, on May 19, 2003, that the children were dependent and awarding their custody to the aunt and uncle, and that the juvenile court erred in relieving DHR of its responsibility to provide services for the parents after October 2003. We address these issues in reverse order.

The October 23, 2003, Order
In his brief on appeal, the father asserts a one-sentence argument that the juvenile court abused its discretion in entering its October 23, 2003, order that provided that DHR was no longer required to provide reunification services to the parents. We first note that no party sought appellate review of that order at the time it was entered. See Rule 4(a)(1)(E), Ala. R.App. P. Further, the "argument" in the father's brief on appeal on this issue is cursory and is unsupported by citations to applicable supporting authority. See Rule 28(a)(10), Ala. R.App. P. Based on the procedural history of this case and the argument contained in the father's brief on appeal, we must conclude that the father has failed to demonstrate error with regard to this issue.

*1207 Service on the Father

With respect to the service issue, the record before us does not indicate that the father raised this issue in the juvenile court. See Centers v. Jackson County Dep't of Pensions & Sec., 472 So.2d 1069, 1070 (Ala.Civ.App.1985) (refusing to consider an issue raised for the first time on appeal). "`If there was improper procedure or an absence of proper procedure at trial, the attention of the trial judge must have been directed to it either at the time or by proper and timely post-trial motion. Without such in the record, there is nothing for our review.'" Id. (quoting Embroy v. State Dep't of Pensions & Sec., 450 So.2d 127, 129 (Ala.Civ.App.1984)). Although the father contends that his attorney objected to the lack of service in the juvenile court, "[a] trial court should not be placed in error on matters which the record reveals that it neither ruled upon nor was presented the opportunity to rule upon." Wilson v. State Dep't of Human Res., 527 So.2d 1322, 1325 (Ala.Civ.App. 1988) (quoted in J.K. v. Lee County Dep't of Human Res., 668 So.2d 813, 817 (Ala. Civ.App.1995)). Moreover, the father did not appeal from the juvenile court's dependency determination. See Rule 4(a)(1)(E), Ala. R.App. P. Therefore, we conclude that the father has failed to demonstrate error with regard to this issue.

Failure to Make a Specific Finding of Dependency
The mother argues that the juvenile court's judgment terminating her parental rights did not contain a specific finding that the children continued to be dependent. However, a finding of dependency, while preferable, is not required. M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004, 1006 (Ala.Civ.App.1991). This court has previously held that a finding of dependency may be implicit in a juvenile court's judgment terminating parental rights. In State Department of Human Resources v. A.K., 851 So.2d 1, 8 (Ala.Civ.App.2002), we stated:
"Although the trial court did not make a specific finding that the children were dependent, it found that neither parent was capable of providing a stable, suitable home for the children. Given the trial court's previous dependency determinations in this case, the facts of this case, and the nature of the factual findings contained in the . . . judgment, we conclude that a finding of dependency was implicit in the trial court's judgment."
The same reasoning applies to this case, and, therefore, we conclude that a dependency finding was implicit in the trial court's judgment.

Whether the Evidence Supports the Termination Decision
We now address the primary contentions raised by the mother and the father, i.e., whether DHR failed to present sufficient evidence to establish grounds for the termination of their parental rights, and whether the juvenile court erroneously failed to consider the aunt and uncle a as viable alternative to the termination of parental rights. In addressing these issues, this opinion is confined to the issues and arguments raised in the parents' briefs on appeal.[5]
*1208 Section 26-18-7, Ala.Code 1975, sets out the statutory grounds for terminating parental rights:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by [DHR] or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .

*1209 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
A juvenile court's decision in proceedings to terminate parental rights is presumed correct when it is based on ore tenus evidence, and its decision will be set aside only if the record reveals the decision to be plainly and palpably wrong. M.J.G.L. v. State Dep't of Human Res., supra. When the State is the petitioner in termination proceedings, the juvenile court must apply a two-pronged test in deciding whether to terminate parental rights. First, the court must find from clear and convincing evidence that there are grounds for the termination of parental rights, including, but not limited to, the grounds set out in § 26-18-7; second, the court must determine whether all viable alternatives to the termination of parental rights have been considered. Ex parte Beasley, 564 So.2d 950, 954-55 (Ala.1990). See also T.C. v. Cullman County Dep't of Human Res., 899 So.2d 281 (Ala.Civ.App.2004); and E.Z. v. Calhoun County Dep't of Human Res., 828 So.2d 332 (Ala.Civ.App. 2002). In deciding to terminate parental rights, a juvenile court may consider the past history of the family as well as the evidence pertaining to current conditions. Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala.1993) (citing Fitzgerald v. Fitzgerald, 490 So.2d 4, 6 (Ala.Civ.App. 1986)); see also S.B.L. v. Cleburne County Dep't of Human Res., 881 So.2d 1029, 1032 (Ala.Civ.App.2003), and J.R. v. D.A.M., 615 So.2d 609, 612 (Ala.Civ.App.1992). The paramount consideration in a case involving the termination of parental rights is the best interests of the child or children involved. Ex parte J.R., 896 So.2d 416 (Ala.2004); Q.F. v. Madison County Dep't of Human Res., 891 So.2d 330 (Ala.Civ. App.2004); and J.L. v. State Dep't of Human Res., 688 So.2d 868, 869 (Ala.Civ.App. 1997).

A. Grounds for Termination
The parents do not dispute that much of their conduct in the past supports a termination decision. Rather, the father asserts a brief argument that DHR was required to present evidence that it had made "reasonable efforts . . . toward the rehabilitation of the parents [and that those efforts] ha[d] failed." See § 26-18-7(a)(6), Ala. Code 1975. The mother maintains that the juvenile court's judgment does not contain any language indicating that it determined that she was unable or unwilling to discharge her parental responsibilities or that her situation was unlikely to change in the foreseeable future. See § 26-17-8(a), *1210 Ala.Code 1975. The parents also argue that in the recent past they have made progress toward reunification and that those efforts indicate a current willingness to discharge their parental responsibilities. We note that in support of these arguments the parents cite only general propositions of law and make no effort to apply the holdings of the authorities they do cite to the facts of this case; out of an abundance of caution, however, we address the arguments.
Initially, we find the mother's argument that the juvenile court's judgment does not contain language indicating that it considered whether her (or both parents') situation was unlikely to improve in the foreseeable future to be unpersuasive. The September 29, 2004, judgment contains findings pertaining to the father and his (and, therefore, the mother's) living situation. In addition, the juvenile court noted that although the parents had represented in the April 14, 2004, joint petition for custody that they were living with the aunt and uncle, that situation was of short duration, and it further noted that the parents were living in a home with no electric service.[6]
Further, it is well settled that "the [juvenile] court is not required to make specific findings in a termination of parental rights case." T.P. v. S.P., 681 So.2d 624, 626 (Ala.Civ.App.1996); see also Ex parte State Dep't of Human Res., supra; and W.M. v. State Dep't of Human Res., 634 So.2d 143, 146 (Ala.Civ.App. 1993). An appellate court may not assume error on the part of the trial court. Marvin's, Inc. v. Robertson, 608 So.2d 391, 393 (Ala.1992). In the absence of specific factual findings, this court must assume that the trial court made those findings necessary to support its judgment. Ex parte Fann, 810 So.2d 631, 637 (Ala.2001); and Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).
The record indicates that DHR made numerous efforts to rehabilitate the parents. Those efforts included parenting classes, housekeeping and hygiene training sessions, psychological evaluations and counseling services, and financial support. The parents, either through inability or unwillingness, did not improve their situation during the time that DHR worked with them to reunite the family. Both parents did complete parenting classes. However, the mother visited the children only sporadically. Although the father visited regularly, Norwood testified that he was unable to properly parent the children. DHR social workers attempted to assist the parents in managing their finances. *1211 DHR went so far as to pay some of the parents' bills and to assist in arranging for the donation of furniture and household supplies for the parents. However, the parents remained unable to properly manage their finances. When DHR's efforts to rehabilitate the parents through the offered services failed, the juvenile court excused DHR from providing further services. The mother did not challenge that ruling, and, as already discussed, the father failed to demonstrate error with regard to that ruling.
The evidence pertaining to the parents' efforts and conduct before the October 23, 2003, permanency order clearly supports a conclusion that grounds existed for the termination of the parents' parental rights. The record supports the juvenile court's findings that DHR had worked extensively with the parents and that although the parents had taken advantage of some of the services offered by DHR, the parents had made little or no progress in becoming better able to meet the needs of their children. In the factual findings in its judgment, the juvenile court also noted the parents' inability or unwillingness to learn to meet the specialized needs of their children. Given the foregoing, we cannot agree with the father's argument that DHR did not present evidence that it had made reasonable efforts to rehabilitate the parents.
The evidence in the record also supports a conclusion that the parents' circumstances have not changed and are not likely to change in the future. See § 26-18-7(a), Ala.Code 1975; T.C. v. Cullman County Dep't of Human Res., supra; E.Z. v. Calhoun County Dep't of Human Res., supra; and B.M. v. State, 895 So.2d 319 (Ala.Civ.App.2004). With regard to her argument that the parents had made progress toward reunification shortly before the September 13, 2004, hearing, the mother cites the father's employment, the parents' completion of parenting classes, her "cognitive ability" to parent the children, and the fact that the parents now own a mobile home and have transportation. She maintains that those factors indicate that the parents have adjusted their circumstances to meet the needs of their children.
Although both parents have been employed at various times during the pendency of this matter, neither parent has contributed any amount toward the support of their children. The mother points out in her brief that no court order was in place requiring her to pay child support.
At the time of the September 13, 2004, hearing, the father was employed working with his brother for a tile company. As the juvenile court noted in its judgment, the father was dependent on family members for transportation to his employment because he does not have a driver's license. The mother has a driver's license and transportation, but she was unemployed at the time of the September 13, 2004, hearing. Other than the mother's testimony regarding the amount of the father's income, her representation that she and the father did not have any rent-to-own items, and her explanation of how she spent the father's most recent paycheck, there was no evidence regarding the parents' more recent management of their finances.
The evidence at the September 13, 2004, hearing indicated that the parents had purchased a mobile home six months earlier, but that, at the time of the hearing, that mobile home still did not have electric service. The parents have a history of failing to maintain utility services to their previous homes; the evidence would support a conclusion that they were still having difficulty in that regard.
*1212 Further, the evidence supports a conclusion that the parents have not maintained a stable household. The parents separated several times during their four-year marriage and had been together for one and a half years at the time of the hearing. The parents had lived with the aunt and uncle until approximately six months before the hearing. The parents had been living in the mobile home only for the four weeks immediately preceding the hearing; there was no evidence regarding where the parents had lived in the months between the time they moved from the aunt and uncle's home and moved into that mobile home.
As part of his argument pertaining to the grounds on which the juvenile court relied in reaching its judgment, the father maintains that the juvenile court improperly based its termination decision on his low IQ without considering his desire and willingness to work toward reunification. In support of his argument, the father cites Wishinsky v. State Department of Human Resources, 512 So.2d 122 (Ala.Civ.App.1987), in which this court reversed the juvenile court's judgment terminating the mother's parental rights. In that case, the evidence indicated that the mother, who was borderline mentally retarded, had made progress in her continuing and consistent efforts to regain custody of her children and that various community members had promised to provide assistance and supervision if the child were placed with the mother. In this case, the father, like the mother in Wishinsky, supra, completed parenting classes. However, the evidence indicates that the father was unable to put into practice the information he might have learned during the parenting classes and that he is unable to appropriately parent or direct the children.
The evidence supports a conclusion that the parents have made little progress since October 2003. Although the parents maintain that they have made recent progress toward reunification, "the juvenile court could have concluded that [the parents were] not credible or that, given [their] history, [the parents'] allegedly improved circumstances were an anomaly." A.A. v. Cleburne County Dep't of Human Res., 912 So.2d 261, 273 (Ala.Civ.App.2005) (citing J.D. v. Cherokee County Dep't of Human Res., 858 So.2d 274 (Ala.Civ.App. 2003)). As already stated, the juvenile court could have also properly considered the family's history in deciding whether to terminate the parents' parental rights. Ex parte State Dep't of Human Res., supra; and Fitzgerald v. Fitzgerald, supra. We cannot say that the parents have demonstrated that the evidence does not support the conclusion that grounds existed for the termination of their parental rights.

B. Viable Alternatives
The parents argue on appeal that the juvenile court did not properly consider less drastic alternatives to the termination of their parental rights. In his statement of the standard of review, the father cites authority for the proposition that DHR was required to present evidence of its recent attempts to locate viable alternatives to the termination of his parental rights. See Bowman v. State Dep't of Human Res., 534 So.2d 304 (Ala. Civ.App.1988); see also V.M. v. State Dep't of Human Res., 710 So.2d 915 (Ala.Civ. App.1998) (holding that DHR must present evidence of recent attempts to locate alternatives to the termination of a parent's parental rights). However, in his argument in his brief on appeal, the father only identifies the reunification of the family as a viable alternative to the termination of his parental rights. As discussed earlier in this opinion, the evidence supports *1213 a conclusion that reasonable efforts at reunification of the family have failed.
In addition to advocating the return of the children to the parents as an alternative to the termination of her parental rights, the mother also maintains that the aunt and uncle are willing to serve as an alternative placement for the children; the only relative resources advocated by the mother at the September 13, 2004, hearing were the aunt and uncle. The mother makes no argument that DHR failed to demonstrate that it had made recent efforts to locate viable alternatives to the termination of the parents' parental rights.
The juvenile court's judgment does not specifically state that it rejected the aunt and uncle as "viable alternatives to the termination of the parents' parental rights." This court has held that in reaching a termination-of-parental-rights judgment, a juvenile court is not required to make a specific finding that it had considered and rejected all viable alternatives to the termination of parental rights. T.P. v. S.P., 681 So.2d at 626. The juvenile court's judgment indicates, however, that, in denying the joint petition for custody filed by the parents and the aunt, it did consider the aunt as an alternative to the termination of parental rights. In addition, the juvenile court's judgment contains factual findings pertaining to the children's placement with the aunt and uncle, including findings that the stress of having the children in her care had negatively affected the aunt's health, as well as a finding that the aunt and uncle had been among the parties who had agreed to place the children in foster care in September 2003.[7]
The record indicates that although the aunt and uncle provided excellent care for the children during the time the children were in their home, that placement was ultimately unsuccessful. The aunt and the uncle testified that they asked that the children be removed from their home because of the aunt's concern about her possible seizures, because of the stress to the uncle caused by having the children, and because of the sleep deprivation caused by the youngest child's need for a sleep-apnea monitor. At the September 13, 2004, hearing, the aunt believed that because the youngest child had outgrown the need for a sleep-apnea monitor, sleep deprivation would no longer be a concern. There was no evidence, however, that the stress imposed by placing the children in the home of the aunt and uncle would not be an issue for either of them if the children were returned to that placement.
Norwood testified that both the aunt and the uncle had often expressed doubts about whether they could provide long-term care for the children. Her testimony, in part, was as follows:
"And I worked with them from February [until], I guess it was in May when they started expressing that they could not do that for the long haul. [The aunt] was having some health problems and [the uncle] had called on one occasion and said that, you know, he would like for the kids to be moved because his nerves just couldn't take it.
"And then I talked with [the aunt] the next day and she said we're going to hang in there a little while longer. And we went through that for probably two *1214 or three months of, `yeah, we can do this,' and `no, we can't do this.'"
During the September 13, 2004, hearing, Norwood explained that DHR's decision not to place the children with the aunt and uncle was
"[b]ecause during the time that [the children were] with [the aunt and uncle], they each called our office on multiple occasions asking that these children be moved. . . . And everything they were doing and saying was, `Yes, we love these kids more than anything, but we can't do this.'"
In this case, the juvenile court could have been concerned about the effects the stress of returning the children to the aunt and uncle's home might have on the health of the aunt and the uncle, about the aunt's and the uncle's expressions of doubt regarding their ability to care for the children on a long-term basis, and about the previous unsuccessful placement of the children with the aunt and uncle. The record contains evidence that would support the conclusion that the aunt and uncle were not a viable alternative to the termination of the parents' parental rights. See T.P. v. S.P., supra (concluding that the evidence supported a finding that there were no viable alternatives to the termination of parental rights where the juvenile court made no specific finding to that effect). See also Ex parte Fann, supra, and Ex parte Bryowsky, supra (an appellate court must assume that the trial court made those findings necessary to support its judgment).
In reaching our holding in this case, this court has kept in mind the well-settled principle that a trial court's judgment, which was based on ore tenus evidence, is entitled to a presumption of correctness. M.J.G.L. v. State Dep't of Human Res., supra. The juvenile court was in the best position to observe the witnesses while they testified and to evaluate their demeanor and credibility. Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). "Moreover, `[b]ecause the trial court has the advantage of observing the witnesses' demeanor and has a superior opportunity to assess their credibility, [an appellate court] cannot alter the trial court's judgment unless it is so unsupported by the evidence as to be clearly and palpably wrong.'" Ex parte Fann, 810 So.2d at 636 (quoting Ex parte D.W.W., 717 So.2d 793, 795 (Ala.1998)). "The trial court, as the finder of fact, is required to resolve conflicts in the evidence." Ethridge v. Wright, 688 So.2d 818, 820 (Ala.Civ.App.1996).
"`[The appellate court is not] allowed to reweigh the evidence in this case. This case ... turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence. . . .'"
Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997) (quoting Ex parte Bryowsky, 676 So.2d at 1326).
"Cases involving the termination of a parent's right to his or her children are the most difficult decisions faced by our juvenile courts. Although in some cases the evidence overwhelmingly and without question supports the termination of a parent's rights, in many cases the evidence is not entirely without dispute and may, under one view, suggest that termination is not entirely appropriate. In those cases, our role as an appellate court is clear: we must presume that the judgment terminating parental rights is correct and we may reverse only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. *1215 R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App.1995)."
B.M. v. State, 895 So.2d at 335 (emphasis added).
The record demonstrates that the juvenile court properly considered the factors set forth in § 26-18-7 and the applicable two-prong test in determining that the children were dependent and that there were no viable alternatives to the termination of the parents' parental rights. See B.M. v. State, supra; T.C. v. Cullman County Dep't of Human Res., supra; E.Z. v. Calhoun County Dep't of Human Res., supra; and Ex parte Beasley, supra. Given the facts of this case and the presumption of correctness that attaches to the juvenile court's judgment, see B.M. v. State, supra, which is based on the juvenile court's unique ability to observe the parties and witnesses as they testify and to assess their demeanor and credibility, the juvenile court's judgment terminating the mother's and the father's parental rights is due to be affirmed.
The juvenile court concluded that it was in the best interests of the children that custody be awarded to DHR and that they be placed for adoption. Neither of the parents has made an argument that the termination of their parental rights is not in the children's best interests.
Given the foregoing, we hold that the parents have failed to demonstrate that the juvenile court abused its discretion in reaching that part of its judgment that terminated their parental rights. For the reasons discussed above, the appeal filed by the aunt and uncle is due to be dismissed.
2040107APPEAL DISMISSED.
2040108 and 2040109AFFIRMED.
THOMPSON and PITTMAN, JJ., concur.
BRYAN, J., concurs in the result, without writing.
CRAWLEY, P.J., concurs in part and dissents in part, with writing, which MURDOCK, J., joins.
CRAWLEY, Presiding Judge, concurring in part and dissenting in part.
I concur in the dismissal of the appeal in case no. 2040107. In case no. 2040108 and case no. 2040109, however, I do not believe that the Department of Human Resources ("DHR") met its burden of establishing, by clear and convincing evidence, either that there were grounds for termination of the parental rights of P.H. ("the father") and C.W.H. ("the mother") or that there was no viable alternative to termination of their rights. Therefore, I dissent from the affirmance of the juvenile court's judgment in those appeals.

Grounds for Termination
The evidence was undisputed that any parenting deficiencies from which the mother and the father suffer are due to their limited intellectual functioning and not to any abuse or intentional neglect of the children. They have cooperated with DHR's offers of assistance and have made recent progress in independent-living skills. It is clear that these parents love their children. It is also clear that the termination of their parental rights was premature, not supported by clear and convincing evidence, and that other less drastic alternatives exist. See L.A.G. v. State Dep't of Human Res., 681 So.2d 596 (Ala.Civ.App.1996); and Wishinsky v. State Dep't of Human Res., 512 So.2d 122 (Ala.Civ.App.1987).
Section 26-18-7(a), Ala.Code 1975, provides:
"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to *1216 discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
(Emphasis added.) DHR presented clear and convincing evidence that, at times before September 13, 2004, when the hearing on termination of parental rights was held, the parents had been unable or unwilling to discharge their responsibility to the children. The issue raised on these appeals, however, is whether DHR presented clear and convincing evidence that "such conduct or condition [was] unlikely to change in the foreseeable future." See D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 93-94 (Ala.Civ.App.2003)(plurality opinion).
The record demonstrates not only that DHR failed to prove that the parents' past "conduct or condition [was] unlikely to change in the foreseeable future," but also that DHR did not even attempt to prove that fact. In response to evidence indicating that the parents had made measurable progress towards stabilizing their marriage and their living conditions by purchasing a home and prepaying two years' of fixed rental expenses, as well as evidence indicating that they were learning to manage their finances and were enjoying a regular income from the father's employment, DHR submitted nothing other than the testimony of its social workers that such improvements were, in effect, beside the point because, after the October 23, 2003, permanency order, DHR had determined, with the approval of the juvenile court, that the children's future did not include reunification with their biological parents and, accordingly, had placed them with prospective adoptive parents.
In J.D. v. Cherokee County Department of Human Resources, 858 So.2d 274 (Ala. Civ.App.2003), a parent argued that the decision to terminate her parental rights was premature (and, therefore, that her past conduct was not "unlikely to change in the foreseeable future") because the evidence indicated that she was making an effort to improve her living conditions and to comply with the standards required in her individualized service plan. Discussing prior cases dealing with the "prematurity" argument, this court phrased the relevant inquiries as follows:
"(1) whether DHR (and the trial court) had seriously considered the parent's recent efforts to adjust his circumstances to meet the needs of the child, and if so, (2) whether the parent's recent progress was substantial and consistent and, therefore, indicative of a willingness and ability to maintain that progress, or whether the parent's efforts were late, incomplete and, therefore, unconvincing, measures taken only in anticipation of the termination-of-parental-rights hearing."
858 So.2d at 277 (citations omitted).
By affirming the juvenile court's judgment terminating the parents' parental rights in this case, the majority of this court has apparently concluded either (1) that the juvenile court "seriously considered" the parents' recent efforts but implicitly determined that those efforts were incomplete and, therefore, unconvincing, measures taken only in anticipation of the termination-of-parental-rights hearing, or (2) that the parents' recent progress was insubstantial and inconsistent and, therefore, not indicative of the parents' willingness and ability to maintain that progress. Unlike the majority, I cannot reach either of those conclusions. The juvenile court's judgment recites only the parents' deficiencies and makes no reference to the *1217 parents' recent progress toward achieving the goals for reunification with their children. Because the juvenile court's judgment contains a lengthy summary of the parents' past conduct but does not refer to the apparent improvements in their present situation, much less draw any inference as to whether the parents are likely to become fit in the foreseeable future, I cannot deduce that the trial court "seriously considered" the parents' recent progress, much less that the court implicitly found that the parents' past conduct or condition was "unlikely to change in the foreseeable future." Instead, I conclude that the trial court, like DHR, must have believed that any improvement in the parents' current situation, and the implications to be drawn from any such improvement, were simply beside the point after the October 23, 2003, permanency order approving DHR's plan to proceed with adoption.
Of course, to the extent that the parents' current situation reflects an "effort by the parent[s] to adjust [their] circumstances to meet the needs of the child," see § 26-18-7(b)(4), Ala.Code 1975, it indicates that the past conduct or condition of the parents was not "unlikely to change in the foreseeable future" and was thus highly relevant at the parental-rights-termination proceeding.
"[T]he Ex parte Beasley[,564 So.2d 950, 954-55 (Ala.1990),] Court made it clear that the `grounds-for-termination' prong is satisfied when the parents are irremediably `unable or unwilling' to serve as fit parents or where the parents' disqualifying `conduct or condition is unlikely to change in the foreseeable future.'"
D.M.P. v. State Dep't of Human Res., 871 So.2d at 93. The fact that, on October 23, 2003, the juvenile court relieved DHR of the obligation to continue reasonable efforts to reunify the family and to proceed, instead, with a permanency plan of adoption did not relieve the juvenile court of the obligation to hold DHR to its burden, at the parental-rights-termination proceeding, of proving, clearly and convincingly, the grounds for terminationa part of which was to establish that the parents' unsuitable "conduct or condition is unlikely to change in the foreseeable future." Whether the juvenile court correctly applied this legal standard is a question of law that is not subject to the ore tenus rule as the majority opinion suggests.
The parents do not argue that DHR had no basis upon which to discontinue reasonable reunification efforts or that the juvenile court's permanency order was erroneous. Subsections (m) and (n) of § 12-15-65, Ala.Code 1975, clearly give DHR the right to discontinue, under certain circumstances, reasonable efforts to reunify a child with his family. Those subsections provide:
"(m) As used in this chapter, `reasonable efforts' refers to efforts made to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home, and to make it possible for a child to return safely to the child's home. In determining the reasonable efforts to be made with respect to a child, and in making such reasonable efforts, the child's health and safety shall be the paramount concern. If continuation of reasonable efforts is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child and to complete whatever steps are necessary to finalize the permanent placement of the child. Reasonable efforts shall not be required to be made where the parental rights to a sibling have been involuntarily terminated *1218 or where a court of competent jurisdiction has determined that a parent has done any of the following:
"(1) Subjected the child to an aggravating circumstance, including, but not limited to, abandonment, torture, chronic abuse, substance abuse, or sexual abuse.
"(2) Committed murder or voluntary manslaughter of another child of such parent.
"(3) Aided or abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of another child of such parent.
"(4) Committed a felony assault which resulted in the serious bodily injury to the child or another child of such parent. The term `serious bodily injury' means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
"Nothing in the exceptions to making reasonable efforts listed in this subsection shall be interpreted to require the reunification of a child with a stepparent or paramour of a parent under similar circumstances.
"(n) If reasonable efforts are not made with respect to a child as a result of a determination made by a court of competent jurisdiction in situations as described above, a permanency hearing, as provided in Section 12-15-62, shall be held for the child within 30 days after the determination. Reasonable efforts shall be made to place the child and to complete whatever steps are necessary to finalize the permanent placement of the child. Reasonable efforts to place a child for adoption or with a legal guardian or custodian may be made concurrently with other reasonable efforts."
(Emphasis added.)
Because this court has not been presented with the argument that DHR was erroneously relieved of its obligation to continue reasonable reunification efforts in this case, I will not address the propriety of the juvenile court's permanency order except to note that, even if a permanency plan involves adoption, DHR may still engage in "concurrent planning." See § 12-15-65(n)(last sentence); and C.H. v. State Dep't of Human Res., 841 So.2d 1281, 1284 (Ala.Civ.App.2002) (describing DHR's "concurrent plan in which it would work toward reunifying the children with the parents while making preparations for the termination of the parents' parental rights in the event such reunification was not possible"). The fact that DHR did not engage in concurrent planning in this case and was, therefore, not intimately involved with the parents' recent progress does not mean that DHR could ignore recent developments in the parents' condition and still expect to meet its burden of proving the statutory grounds for termination of their parental rights.
I believe that DHR failed to prove that the parents' past conduct or condition (indicating that they had been unable or unwilling to properly care for the children) was "unlikely to change in the foreseeable future." That is to say, DHR did not meet its burden of proving the statutory grounds for the termination of parental rights.

Placement with the Children's Maternal Great Aunt and Great Uncle as a Viable Alternative to Termination of Parental Rights
The juvenile court could not order the termination of parental rights so long as there was a viable alternative to doing so. See D.M.P. v. State Dep't of Human Res., *1219 871 So.2d at 91-92. The children's great aunt and great uncle, who have been married for over 30 years, are in their early fifties, retired, and at home all day. They live in a five-bedroom, four-and-one-half-bath home. They have been foster parents for handicapped and medically fragile children. The great aunt has been a foster parent for 25 years. The testimony was undisputed that the great aunt and great uncle loved the children and provided them with excellent care for seven months.
The only possibly negative testimony concerning the great aunt and great uncle related to the fact that, during the time they had custody of the children, they had expressed doubts about their ability to provide the children with long-term care. The great aunt explained that their doubts had arisen because of their own health issues and the children's health and behavioral issues, most of which had been resolved or greatly diminished by the time of the termination hearing. The great aunt testified that when the younger child was placed in her custody, he was a medically fragile infant who had been attached to a sleep-apnea monitor; she said that the monitor sounded so often during the night that the child, as well as she and her husband, were always exhausted from lack of sleep. Specifically, she said that her husband's "nerves just couldn't take it." The great aunt also testified that she was concerned that she may have had one or more seizures, which, she said, made her doubt whether she could safely care for the children.
The majority opinion states that "[t]here was no evidence ... that the stress imposed by placing the children in the home of the aunt and uncle would not be an issue for either of them if the children were returned to that placement." 919 So.2d at 1213. On the contrary, the great aunt explained that the younger child had out-grown his infantile medical problems and was no longer required to be monitored at night. Accordingly, she said, sleep deprivation would not be an issue if the children were placed with them again. Moreover, she explained that the older child's cognitive and behavioral problems had greatly improved as a consequence of the special-educational therapy he was receiving. DHR witnesses corroborated the great aunt's testimony that the medical and behavioral problems of both children had greatly improved during the year preceding the termination hearing. The great uncle testified that he and his wife were willing and able to provide for the children with no assistance from the State. Specifically, he stated that he had no health problems that would keep him from being able to raise the children.
In Ex parte J.R., 896 So.2d 416 (Ala. 2004), the Alabama Supreme Court reversed a decision by this court that had affirmed a juvenile court's judgment terminating a mother's parental rights. The supreme court held that DHR had failed to investigate an aunt and uncle (the father's brother) to determine whether they would be suitable custodians for the child and, thus, whether placement of the child with them was a viable alternative to termination of the mother's rights. In J.R., the child had been sexually abused by her father. A DHR social worker who saw the father and the child's uncle together at a court hearing concluded, on that basis alone, that the father and the uncle had a close relationship and that the uncle would, therefore, not be a protector for the child. The uncle testified at the termination proceeding that, before the court hearing, he had not seen the father for over three years, that they did not have a close relationship, and that if he were to be given custody of the child he would not allow the father in his home.
The supreme court stated:

*1220 "`DHRnot the prospective custodianhas the burden of initiating investigations, and it is DHR's burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child.'"
Ex parte J.R., 896 So.2d at 428 (quoting D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 591 (Ala.Civ.App. 1999)). The supreme court determined that the social worker's fears about any relationship between the uncle and the father "could have been allayed after an investigation of the facts of [the uncle's] relationship with his brother." 896 So.2d at 425.
In the present case, DHR's decision not to consider placement of the children with the great aunt and great uncle as a viable alternative to termination of the parents' rights was more arbitrary than its decision to dismiss the uncle as a relative resource in J.R. Here, DHR was not required to perform an investigation of the great aunt and great uncle in order to allay any fears about their suitability as custodians for the children. DHR was already aware of their suitability; its witness testified that the great aunt and great uncle loved the children and had provided them with excellent care for seven months. In addition, DHR was evidently convinced of the great aunt's competence as a caregiver even after the children were removed from her home because it asked the great aunt to assist the children's first foster mother, whose husband was deployed overseas in the military service, in caring for the children.
The only "fear" that DHR social worker Tracy Norwood expressed about the couple related to the great aunt's medical condition. The great aunt herself, however, allayed that fear by reporting to Norwood an updated diagnosis that ruled out either a seizure disorder or any other serious medical condition that would have precluded her as a caregiver for the children.
When asked why DHR made no further attempt to rehabilitate the parents, to arrange for the children to visit the parents or great aunt and great uncle, or to reunify the family after October 2003, DHR foster-care worker Kristie Alexander testified that the directive of the juvenile court, in its permanency order of October 23, 2003, was "to proceed with our termination of parental rights and adoption for these children." She stated that no reunification efforts were necessary after the juvenile court ruled that DHR "did not have to work with the family and so [she] had no reason to work with the [great aunt and great uncle]." Responding to the question by the attorney for the great aunt and great uncle, "And after that, it was just ruled that [DHR] didn't have to do another thing as far as any sort of family reunification, is that correct?" Alexander answered, "That's correct."
I can only conclude that, having been informed by the juvenile court at the permanency hearing that it need not make any further efforts at reunification of the family and could proceed with adoption planning for the children, and having located prospective adoptive parents in R.V. and A.V., DHR summarily rejected the possibility of an outcome for the children other than adoption. Compare V.M. v. State Department of Human Resources, 710 So.2d 915, 921 (Ala.Civ.App.1998), in which this court stated:
"This court is concerned that the decision to file the petitions to terminate parental rights in these cases was made by the trial court, not by DHR. We are especially concerned that the trial court's instruction to DHR to file the petitions came at a time when the record demonstrates that the mother was making progress toward meeting the goals *1221 DHR had established for her. Pursuant to the terms of a consent judgment in federal litigation, DHR has an affirmative duty to facilitate family reunification whenever that goal is possible. See generally R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997). Rehabilitation of a parent and family reunification take time. Often, despite the best efforts of DHR, rehabilitation and reunification are not successful. In these cases, though, the evidence reflects that at the time the trial court heard the evidence the mother was in the process of rehabilitating herself and the time and effort expended by DHR had resulted in the possibility that this family could be reunited. We recognize that incidents occurred in this family's past that would have been grounds for the termination of parental rights. Nevertheless, [at the time of the termination hearing], the mother was making a diligent effort to adjust her circumstances to meet the needs of the children; therefore, a viable alternative to termination of her parental rights existed."
I am troubled by the fact that, once DHR located prospective adoptive parents for the children in this case, it ceased all further efforts at reunification and failed to reassess the great aunt and great uncle as relative resources for the children.
"Federal child welfare policy has recently shifted its emphasis from preserving families toward expediting termination of parental rights to `free' children in foster care for adoption. The Adoption and Safe Families Act (ASFA), passed in 1997, . . . . imposes a swifter and rigid time frame for state agencies to initiate petitions to terminate parental rights and offers financial incentives for states to increase the number of adoptions of children in foster care."
Susan L. Brooks & Dorothy E. Roberts, Social Justice and Family Court Reform, 40 Fam. Court Rev. 453, 454 (2002) (footnote omitted).
"[T]he federal government has provided adoption subsidies of up to $6,000 per adopted child to assist states in increasing the percentage of out-of-home children who achieve permanence through adoption. In addition to the adoption subsidies, in 2003 the United States Department of Health & Human Services awarded 25 states $14.9 million in adoption `bonuses' because those states `completed more adoptions in 2002 than in each of the five previous years.' The adoption bonuses were not insubstantial: (1) Florida, $3,520,000; (2) New Jersey, $1,932,000; (3) Ohio, $1,100,000; (4) Pennsylvania, $1,172,000; (5) Tennessee, $1,148,000; and (6) Wisconsin, $1,158,000.
"The child welfare system is becoming more federalized because of states' need for a steady stream of federal financial resources and the concomitant federal expectation of compliance with federal mandates. However, federal resources focus primarily on the last phase of child welfare, permanency, rather than on ameliorating the conditions that lead to child abuse and neglect. Even though the Adoption and Safe Families Act of 1997 has provided the bulk of adoption assistance, the federal government, by contrast, only pays for approximately 15 percent of the state abuse prevention costs. The federal, state, and local out-of-home care costs for the year 2000 were approximately $9.1 billion. . . ."
William W. Patton & Amy M. Pellman, The Reality of Concurrent Planning: Juggling Multiple Family Plans Expeditiously Without Sufficient Resources, 9 U.C. Davis J. Juv. L. & Pol'y 171, 175-76 (2005)(footnote omitted).
*1222 The desirable permanency to be achieved by adoption cannot, constitutionally, be a part of the evidentiary calculus at the adjudicatory stage of a parental-rights-termination proceeding. See Santosky v. Kramer, 455 U.S. 745, 760, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
Because I believe that DHR wholly failed to meet its burden of proving the grounds for termination and the lack of a viable alternative to termination in this case, I would reverse the judgment of the juvenile court. However, even assuming for the sake of argument that DHR proved the grounds for termination, the juvenile court's judgment is due to be reversed and the cause remanded for further proceedings.
Section 26-18-7(a), Ala.Code 1975, provides that when the juvenile court determines that grounds for termination exist, the court "may" terminate parental rights. See also § 12-15-71(a), Ala.Code 1975 (providing the court with alternative dispositions for a dependent child and reserving for "appropriate cases" the alternative of termination). In D.M.P. v. State Department of Human Resources, 871 So.2d 77 (Ala.Civ.App.2003)(plurality opinion), this court stated that "a case would still not be an `appropriate case' for termination if, after considering its alternatives, the court determines that termination is not in fact in the best interest of the child." 871 So.2d at 95 and n. 17. The juvenile court's judgment makes no reference to the existing relationship between the children and their parents. From all that appears, the court failed to consider whether, given the existing emotional bond between the parentsparticularly the fatherand the children, termination of parental rights would be in the children's best interest.
Therefore, at the very least, the judgment of the juvenile court should be reversed and the cause remanded with the following instructions: if the juvenile court determines that grounds for termination do exist, then the court is instructed to decide whether termination is in the best interest of the children or whether, nonetheless, it would be in the children's best interest to place them in the custody of the great aunt and great uncle, thereby allowing a partial preservation of the parent-child relationship. See D.M.P. v. State Dep't of Human Res., 871 So.2d at 95.
MURDOCK, J., concurs.
NOTES
[1] Norwood testified that the events that prompted her to become involved with this family occurred in October 2003; according to her testimony, she was relying on notes in ascertaining that date. However, references in certain court orders and other evidence from the final hearing clarify that those events actually occurred in 2002. For example, Norwood's testimony indicates that at the time of the events that led to her involvement in this matter, B.H. was approximately 16 months old and the mother was pregnant with M.H.
[2] The WIC food program is a federal program entitled the "Special Supplemental Food Program for Women, Infants and Children."
[3] The uncle testified that he was deemed disabled "because I had a nervous breakdown. I had hurt my back out in Texas, but mostly it messed my nerves up." The uncle testified that he was briefly hospitalized on two occasions in the late 1980s because of his mental breakdown.
[4] Specifically, the aunt argues that (1) the juvenile court erred in failing to make a specific finding of dependency, (2) that DHR failed to make proper efforts to rehabilitate the parents and reunite the family, (3) that there is not clear and convincing evidence that the parents were unable or unwilling to discharge their parental obligations, and (4) that the juvenile court erred in "prematurely" excusing DHR from making efforts to offer rehabilitative services to the parents and to explore viable alternatives to the termination of the parents' parental rights.
[5] The special writing mischaracterizes the issues raised by the parents as being "whether DHR presented clear and convincing evidence that `such conduct or condition [was] unlikely to change in the foreseeable future.' See D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 93-94 (Ala.Civ.App.2003) (plurality opinion)." 919 So.2d at 1216 (Crawley, P.J., concurring in part and dissenting in part). In Spradlin v. Spradlin, 601 So.2d 76 (Ala.1992), our supreme court concluded that the appellant had waived a due-process argument by failing to adequately present that issue for appellate review. In so holding, our supreme court stated:

"[A] vague comment is [the appellant's] only reference to due process issues.
"We have stated that it is not the function of this court to do a party's legal research. See Henderson [v. Alabama A & M University], 483 So.2d [392,] 392 [(Ala.1986)]. Similarly, we cannot create legal arguments for a party based on undelineated general propositions unsupported by authority or argument. Ala. R.App. P. 28(a)[(10)]; Brittain v. Ingram, 282 Ala. 158, 209 So.2d 653 (1968) (analyzing the predecessor to Ala. R.App. P. 28); Ex parte Riley, 464 So.2d 92 (Ala.1985). In the present case, we would be hard pressed to even glean the general proposition."
Spradlin v. Spradlin, 601 So.2d at 78-79.
In her brief on appeal, the mother asserts generally that she has made progress toward adjusting her circumstances to meet the needs of her children. The father asserts that the trial court erroneously failed to inquire into his "current ability or willingness" to care for the children. Neither parent cited any authority in support of those "arguments," and neither parent asserted any argument pertaining to whether their circumstances were likely to change in the foreseeable future. In this case, this court "would be hard pressed to even glean the general proposition" advanced by the special writing concerning whether the evidence supports a finding that the parents' circumstances were unlikely to change in the foreseeable future. Spradlin v. Spradlin, 601 So.2d at 79.
[6] In its judgment, the juvenile court found, among other things, that

"[the father] cannot live by himself and depends on family heavily to manage his needs. [The father] has acquired a mobile home with the help of family but has no running electricity to the home at the time of [the hearing]. [The father] testified that he kept his food at a family member's home because they had a refrigerator. He does not have a valid drivers' license and is dependent upon family for transportation. He has been separated and together with [the mother] during the course of DHR involvement with the family. [The father] has not taken care of the minor children independent of another adult supervising and he is incapable of providing the special care that either child requires.
". . . .
". . . The parents had not petitioned for custody until April 14, 2004, in their joint petition for custody filed with [the aunt] but not including [the uncle]. The averments in the petition included that the three joint petitioners were living in the same household; however, in the testimony at the hearing [the mother] indicated that this was a very short period of time and [that the parents] were living in a trailer without water [sic] and electricity."
[7] Among the findings in the juvenile court's judgment was the following:

"The Court found that all parties to this action were in agreement that the minor children should come into the care and custody of [DHR]. [The uncle and aunt] were in agreement with this plan. The minor children were placed in a foster-care home which was also an adoption resource."